# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| NexGen HBM, Inc., and Home Buyers Marketing, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> ListReports, Inc., Ajay Shah, Randy Shiozaki, and Esther Yang, <br><br> Defendants. | Case No. 16-cv-3143 (SRN/FLN) <br><br><br> **ORDER** <br> **FILED UNDER SEAL** |

Michael M. Lafeber and Scott M. Flaherty, Briggs & Morgan, PA, 80 South 8th St., Ste. 2200, Minneapolis, MN 55402 for Plaintiffs.

Matthew B. Kilby, Randall E. Kahnke, and Lauren W. Linderman, Faegre Baker Daniels LLP, 90 South 7th St., Ste. 2200, Minneapolis, MN 55402 for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendants' Motion to Dismiss for Lack of Personal Jurisdiction or, In the Alternative, to Transfer ("Mot. to Dismiss") [Doc. No. 33].

For the reasons set forth below, Defendants' Motion to Dismiss is granted.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  Plaintiffs and Their Products

Plaintiffs NexGen HBM, Inc. and Home Buyers Marketing, Inc. (collectively, "HBM") are Minnesota corporations with their principal places of business in Minnesota. (Compl. at ¶¶ 1–2 [Doc. No. 1].)  HBM provides products and services that help mortgage lenders "increase their productivity and business origination . . . ." (*Id.* at ¶ 11.)  In relevant part, HBM created Home Scouting, a web-based program that allows users to search for available homes, compare homes for sale, obtain property tax records, view data about individual properties, obtain realtor remarks, and communicate with realtors and lenders, along with other interactive features and targeted search capabilities.  (*Id.* at ¶¶ 15–16.) HBM explains that "[w]hile other companies provide analogous search services to potential home buyers," Home Scouting is unique because it is designed to be offered by lenders to home buyers and/or realtors and contains nearly all MLS property listings.  (*See id.* at ¶¶ 12–13, 18–22, 26.)

HBM also sells other related technologies, such as Sold Home Alert—a web-based program that alerts home buyers to open houses matching their interests, new listings, and price changes—and a Customer Relationship Management platform (collectively with Home Scouting, "HBM's Proprietary Products").  (*See id.* at ¶¶ 11, 17, 22–24.)  HBM's Proprietary Products are used by customers nationwide, including in Minnesota.  There is no evidence in the record identifying what percentage of HBM's business is done in Minnesota or involves customers based here.

HBM spent many years and invested millions of dollars to develop, market, and support its Proprietary Products. (*Id.* at ¶¶ 11, 20.) The Proprietary Products are not publicly available, but instead may only be used by lenders, realtors, and home buyers who are given access to them. (*See id.* at ¶ 27; Decl. of Jeff Colville in Opp. to Mot. to Dismiss ("Colville Decl.") at ¶ 5 [Doc. No. 54].) For instance, to log in to Home Scouting, a HBM client must first provide the user with a unique link or code.[1] (Colville Decl. at ¶ 4.)

Users must accept HBM's Terms of Use before they can access the Proprietary Products. (Decl. of Matthew B. Kilby in Support of Mot. to Dismiss ("First Kilby Decl.") [Doc. No. 35], Ex. 1 ("Home Scouting Terms of Use") [Doc. No. 35-1].) Under the "Privacy Policy" portion of these terms, HBM explains that the information contained in the Proprietary Products "is only for your personal, non-commercial use as a bona fide prospective buyer of such property, and may not be used commercially or disclosed, copied, retransmitted or distributed to any other person." (*Id.* at 2.) Later, the user must again agree to only use information obtained from the Proprietary Products for the personal, non-commercial uses previously described. (*Id.* at 4.) Finally, the Terms of Use state as follows:

> **Trade Secrets.** For the purpose of this Terms of Use, "Trade Secrets" means any information which is proprietary to or owned by HBM II relating to the Home Scouting Report, now existing or reasonably foreseeable, whether in a

[1] Defendants dispute whether these authorization codes are closely held, claiming that they can be found through a simple Google search. (Defs.' Reply at 17 [Doc. No. 58].) They argue that because access to HBM's Proprietary Products is essentially public, Plaintiffs cannot claim that Defendants "hacked" their website or that the information on those sites is proprietary and confidential. (*See id.* at 13–15; Defs.' Mem. in Supp. at 13–14 [Doc. No. 34].) However, the Court need not address those issues here as they go to the substance of Plaintiffs' misappropriation claims, not the issue of personal jurisdiction.

written, electronic, verbal, or other form, and includes, without limitation, the following: (a) all websites designed, created and developed by HBM II or its affiliated companies, including all passwords, text, content, color schemes, images, graphics, information, look and feel, layout, methodology, metrics, graphical interfaces and functionality for each website; (b) information and materials comprising or relating to any current, future or proposed products or services; (c) analyses, factual evaluations and/or summaries of real estate listings, compilations, data bases, studies or other printed or electronic documents prepared by anyone in connection with the review or evaluation of any information developed by or pertaining to HBM II; (d) copyrights, patents, patents pending, electronic records, computer processes, computer systems, computer hardware configurations, software source codes and software owned, developed or acquired by HBM II; and (d) other information relating to HBM II that is not commonly known to persons or other sources outside of HBM, whether or not specifically marked or identified as "confidential" or "trade secret" by HBM II.

**Limitations on Use of Trade Secrets.** You agree that you will not: (a) disclose, reveal, divulge, disseminate or deliver (collectively, "Disclose") any Trade Secrets to any third party; (b) use, utilize, employ, lecture upon, publish, rewrite, reproduce or reverse engineer (collectively, "Use") any Trade Secrets, for your benefit or for the benefit of any other person or entity; or (c) authorize or permit any third person or entity to Disclose or Use any Trade Secrets;

**Miscellaneous.** If you are found to be in violation of the terms of this Terms of Use, your access to this website may be temporarily or permanently disabled and you may be held liable for all expenses and damages, including court costs and attorneys' fees, incurred by HBM II, or any of its Affiliated Companies, caused by your failure to abide by the terms and conditions of this Agreement.

You must agree to the Terms of Use set forth herein before you can view listings that match your search criteria on your free Home Scouting Report website. By clicking on the "I Accept" button below you (1) agree to the Terms of Use set forth above and (2) authorize us to share the information collected with the real estate broker and loan officer who may have referred you to us and with others as set forth in the Privacy Policy herein.

(*Id*. at 5.) Notably, the Terms of Use do *not* contain a forum-selection or choice-of-law clause, nor do they mention HBM's geographic location in Minnesota.

HBM's Proprietary Products are hosted on servers located in Minnesota. (Colville Decl. at ¶ 21.) When a user selects the "Contact Us" tab of the Home Scouting website, a telephone number containing a "952" area code associated with Minnesota appears. (*Id.*, Ex. C [Doc. No. 54-3].)

## 2. Defendants and Their Business

Defendant ListReports, Inc. ("ListReports") is a California corporation with its headquarters in California. (Decl. of Ajay Shah in Supp. of Defs.' Mot. to Dismiss ("First Shah Decl.") at ¶ 5 [Doc. No. 41].) ListReports has no offices or employees in Minnesota, is not registered to do business in Minnesota, nor does it pay taxes or own any property in Minnesota. (*Id.*) The company is a relatively recent start up and originally developed and sold products designed to help lenders and realtors create flyers and websites related to home sale events like open houses and property listings. (Compl. at ¶ 28; *see* Suppl. Decl. of Michael M. Lafeber ("Third Lafeber Decl.") [Doc. No. 119], Ex. A at PM-012190[2] [Doc. No. 120].) As described below, ListReports later expanded its product offerings.

Defendant Ajay Shah ("Shah") is the co-founder and CEO of ListReports. (First Shah Decl. at ¶ 1.) Shah is a resident of California, has never lived in or visited Minnesota, and owns no property in Minnesota. (*Id.* at ¶ 4.) Defendant Randy Shiozaki ("Shiozaki") is the co-founder and Head of Design for ListReports. (Decl. of Randy Shiozaki in Supp. of Defs.' Mot. to Dismiss ("Shiozaki Decl.") at ¶ 1 [Doc. No. 37].) He is a resident of California, has never lived in Minnesota or visited (other than perhaps for a layover at the

---

[2] For all exhibits that contain them, the Court cites to the Bates numbers as they appear in the lower right hand corner of the document.

airport), and owns no property in Minnesota. (*Id.* at ¶ 4.) Defendant Esther Yang ("Yang") is a Designer at ListReports. (Decl. of Esther Yang in Supp. of Defs.' Mot. to Dismiss ("Yang Decl.") at ¶ 1 [Doc. No. 38].) She is a resident of California, has never lived in or visited Minnesota, and owns no property in Minnesota. (*Id.* at ¶ 4.)

### 3. Relevant Third Parties

Matt Duffy ("Duffy") is a co-founder of ListReports and occupies a management position at the company, although his exact role is unclear. (*See, e.g.*, Decl. of Michael M. Lafeber ("Second Lafeber Decl.") [Doc. No. 88], Ex. B at LR000614 [Doc. No. 92].) Duffy is involved with marketing, selling, and supporting ListReports' products around the country. (*See id.* at LR000614, 1258, 1765, 1945, 2424, 5265–66.) There is no evidence regarding where Duffy resides.

Sondra Jovel ("Jovel") is the Director of Sales for ListReports. (Second Lafeber Decl., Ex. A at LR001152 [Doc. No. 90].) Jovel is also involved with marketing, selling, and supporting ListReports' products around the country. (*See id.* at LR001152, 2171, 4312, 5691.) There is no evidence regarding where Jovel resides.

Prospect Mortgage, LLC ("Prospect") is a Delaware limited liability corporation with its principal place of business in California. (Kilby Decl., Ex. 6 [Doc. No. 35-6].) Prospect does business in many states and is a registered lender in Minnesota. (*See id.*) The record contains no evidence regarding what percentage of Prospect's business, if any, is conducted in Minnesota. Until May of 2016, Prospect was a longtime HBM customer who used HBM's Proprietary Products. (*See* Compl. at ¶ 34; Colville Decl. at ¶¶ 10–12.)

Skyline Home Loans ("Skyline") is a longtime HBM customer who uses HBM's

Proprietary Products. (*See* Compl. at ¶¶ 38–39; Colville Decl. at ¶ 18.) The record implies that Skyline does business in many states, but there is no evidence whether that includes Minnesota, and if so, the extent of Skyline's business there.

### 4. The Alleged Misappropriation

From April of 2015 through early 2016, ListReports worked to create a program that would compete with HBM's Proprietary Products. Beginning in April of 2015 and continuing for nearly a year thereafter, Shiozaki and Yang repeatedly logged into Home Scouting using access codes provided to them by Prospect and Skyline. (Compl. at ¶¶ 30–32; Colville Decl. at ¶¶ 13–14.) In doing so, they had to—and in fact did—agree to HBM's Terms of Use. (Compl. at ¶ 33; Colville Decl., Exs. A, B (containing Shiozaki's and Yang's accepted terms of use and indicating the source of their access codes) [Doc. Nos. 54-1, 54-2].) In total, Shiozaki accessed Home Scouting at least forty-four times while Yang accessed it at least ten times. (Colville Decl. at ¶¶ 13–14.) Shah also admits that he "viewed portions" of Home Scouting "likely in the first half of 2015," but does not recall "creating a username or account." (Decl. of Michael M. Lafeber ("First Lafeber Decl.") [Doc. No. 72], Ex. C ("Defs.' Ans. to Interrogs.") at 9[3] [Doc. No. 72-1].)

HBM alleges that Shiozaki and Yang used these accesses to copy or otherwise misappropriate HBM's Proprietary Products in their efforts to reverse-engineer a competing product. (Compl. at ¶¶ 30, 34.) Shiozaki and Yang do not deny accessing Home Scouting, but claim that they did so in their capacity as ListReports employees and while physically

---

[3] For this exhibit, the Court cites to the ECF page numbers as they appear in the upper right hand corner of the document.

located in California.  (Shiozaki Decl. at ¶ 5; Yang Decl. at ¶ 5.)  There is no evidence that Shiozaki or Yang had a "proper" purpose for their accesses (e.g., they were personally involved with buying or selling a home, or that ListReports was a contractor, partner, or client of HBM).

In December of 2015, members of ListReports—including Shah and Duffy—met with members of Prospect in California.  (Third Lafeber Decl., Exs. C, D [Doc Nos. 122, 123].)  After this meeting, Shah emailed the Prospect team thanking them for the meeting and stating that he was "really looking forward to working with [Prospect] on a significant partnership."  (Third Lafeber Decl., Ex. E [Doc Nos. 124].)  That same day, Shah emailed a Prospect employee to schedule a time for a "req's gathering session" so that ListReports could provide Prospect with "fully completed specs and designs and timelines before the end of the year . . . ."  (Third Lafeber Decl., Ex. F [Doc. No. 125].)

On December 21, 2015, Shah emailed Prospect with "some of the designs we've been thinking about" attached.  (Third Lafeber Decl., Ex. G at PM-011070 [Doc No. 126].)  The attachment contained a PowerPoint presentation listing Shah and Shiozaki as the contacts for any questions.  (*Id.* at PM-011086.)  An overview slide explained that the presentation contained "preliminary designs for discussion as we move forward with our partnership."  (*Id.* at PM-011072.)  In relevant part, the slide stated that the proposed designs covered "Home Search (aka HBM Replacement)" and that "finalizing designs is a major first step in accelerating development and launch."  (*Id.*)

On March 15, 2016, Shah sent Prospect a letter stating that ListReports was thirty days away from "delivering all key deliverables" including "all components that are

currently supplied by HBM within your organization." (Third Lafeber Decl., Ex. H [Doc No. 127].) Days later, ListReports employees exchanged emails with Prospect—with Shah and Shiozaki copied—aimed at scheduling a product development call. (Third Lafeber Decl., Ex. I [Doc No. 128].) These emails proposed "action items" for ListReports and Prospect. (*Id.* at PM-008362–63.) Prospect would "provide [a] spreadsheet inclusive of all features that HBM has to ensure HBM replacement product covers the bases." (*Id.* at PM-008362.) ListReports would share a "Google Doc" with two Prospect employees "displaying all [the] main features that are being accounted for during Gen 1 launch of HBM replacement product. This can be used to compare against required HBM features." (*Id.* at PM-008363.) In a "General Notes" section, the email stated that "[p]rior to launch of HBM replacement, both sides to be mindful of [Prospect's] priority list of Transitioning current HMB [sic] consumers, Transitioning Agents, Transitioning LO's[4] . . . ." (*Id.*)

Also in March of 2016, Duffy wrote to a Minnesota-based lender to inquire if it used HBM's Proprietary Products. (Second Lafeber Decl., Ex. D [Doc. No. 96].) Duffy expressed his belief that HBM was "based near" the Minnesota lender. (*Id.*) Duffy also explained that ListReports was "looking to build a product with some similar functionality" to HBM's Proprietary Products and wanted to know if the Minnesota lender was in an "enterprise arrangement" with HBM. (*Id.*) The lender said it was not using HBM's Proprietary Products and did not expressly confirm Duffy's suspicion that HBM was located in Minnesota. (*Id.*)

---

[4] Presumably, "LO" stands for "loan officer."

ListReports' efforts culminated with the launch of its "Nest.Me" product and related services in mid-2016. (Compl. at ¶ 35.) HBM alleges that Nest.Me is a "knock-off" of its Proprietary Products that contains many of the same "hallmarks, functionality and features . . . ." (*Id.* at ¶ 36; *see* Colville Decl. at ¶ 17.) Moreover, HBM claims that Nest.Me "was built and developed specifically to allow for the accessing, importation and downloading of HBM's confidential and proprietary databases, including, without limitation, HBM's private consumer real estate search activity and information databases." (Compl. at ¶ 37.)

### 5. Marketing Nest.Me and the Alleged Misrepresentations

Since the launch of Nest.Me—and immediately prior to that launch—ListReports has actively marketed, sold, and supported the product nationwide. Relevant here are ListReports' activities in Minnesota. ListReports does not specifically target Minnesota with advertising or other solicitations. (First Shah Decl. at ¶ 6.) However, according to ListReports, it currently has approximately 95 clients who "may be located or reside in Minnesota and who may use the Nest.Me product at issue." (Defs.' Ans. to Interrogs. at 3, 7–9.) These customers make up less than five percent of ListReports' revenue. (First Shah Decl. at ¶ 6.)

Although ListReports does not specifically target Minnesota with advertisements and solicitations, it has marketed, sold, and supported its Nest.Me product to Minnesota-based lenders (or lenders with offices and employees in Minnesota).[5] (*See, e.g.,* First Lafeber

---

[5] Defendants dispute whether many of these lenders are actually located in Minnesota. The Court has carefully sorted through the voluminous record and cites to those communications where it is clear that the lender has, at a minimum, Minnesota-based loan officers. Moreover, the lenders cited here correspond with Defendants' own list of

Decl., Ex. A at LR000065, LR000089–90, LR000098–100, LR000103, LR000460, LR 001250, LR001621, LR002642; Second Lafeber Decl., Ex. A at LR004325, LR004888, LR005690–91, LR005740.)  For instance, in September of 2016, Jovel travelled to Minnesota for three days to "educate" Minnesota-based employees of a lender (███████) about ListReports' products, including Nest.Me.  (Defs.' Ans. to Interrogs. at 4.)  ListReports employees exchanged numerous training, support, and marketing emails related to Nest.Me with ███████.  (*See, e.g.,* First Lafeber Decl., Ex. A at LR000174–78, LR000614–15, LR001621, LR002319 [Doc. No. 73].)

There is some evidence that Shah was aware of—and at times involved with—the marketing and support for Nest.Me in Minnesota.  For instance, an email from Duffy to ███████, with Shah copied, mentions that Shah "connected" with ███████ regarding a contract for Nest.Me that would give ███████ partial exclusivity to the product in the Minneapolis market.  (Second Lafeber Decl., Ex. F at LR005592–93 [Doc. No. 100].)  Shah was also involved in training and supporting ███████'s use of Nest.Me.  (First Lafeber Decl., Ex. A at LR00568; Second Lafeber Decl., Ex. B at LR005265–67.)  Shah also provided the counter-signed agreement allowing another lender with Minnesota-based loan officers to use Nest.Me.  (*Id.* at LR007343.)

Evidence of Shiozaki's and Yang's involvement with Minnesota customers is more limited.  Shiozaki received, or was forwarded by other ListReports employees, several emails from Minnesota clients regarding Nest.Me billing and design/technical support

lenders who may be located in Minnesota and may use Nest.Me. (*See* Defs.' Ans. to Interrogs. at 7–9.)

issues. (Second Lafeber Decl., Ex. C at LR002832–33, LR007371–72, LR007438 [Doc. No. 94].) Shiozaki was also copied on an email from ListReports to a Minnesota lender thanking it for its business. (*Id.* at LR007689.) As far as the Court can discern, the record contains a single email connecting Yang to a Minnesota client. The email appears to be a technical support request from a Minnesota lender, forwarded to Yang by Duffy. (First Lafeber Decl., Ex. A at LR002541.)

In May of 2016, shortly after the launch of Nest.Me, Prospect terminated its contractual relationship with HBM and adopted Nest.Me. (Colville Decl. at ¶ 12; Compl. at ¶ 44.) There is no evidence in the record that any of HBM's Minnesota-based customers have abandoned the company in favor of ListReports and Nest.Me. Similarly missing is any evidence as to what percentage of HBM's business involves clients who operate in Minnesota as opposed to elsewhere in the country.

HBM alleges that Shah made false and deceptive misrepresentations in an effort to convince Skyline to abandon HBM's Proprietary Products and adopt Nest.Me. (Compl. at ¶¶ 38–41, 44; Colville Decl. at ¶¶ 18–19.) Specifically, HBM contends that Shah represented that Nest.Me contained the same real estate data as HBM's Proprietary Products when it in fact did not. (Compl. at ¶¶ 41–43; Colville at ¶ 18.) Shah also allegedly told Skyline that Prospect terminated its relationship with HBM because very few of Prospect's loan officers were adopting HBM's Proprietary Products when this was not true. (Colville Decl. at ¶¶ 10, 19; Compl. at ¶ 44.) Finally, HBM claims that Shah used its confidential pricing information in an attempt to convince Skyline to switch to Nest.Me. (Compl. at ¶ 39.) Shah does not deny that he spoke with Skyline, but avers that the employees he spoke

with were not located in Minnesota and that he spoke with them while he was in California. (First Shah Decl. at ¶ 7.) HBM was only able to retain Skyline as a client by reducing its prices and the duration of their contractual relationship. (Colville Decl. at ¶ 20.)

**B. Procedural History**

HBM brought thirteen claims against Defendants. (*See* Compl. at ¶¶ 45–139.) HBM asserts each claim against ListReports, but only some of its claims individually against Shah, Shiozaki, and Yang (collectively, the "Individual Defendants"). (*See id.*) HBM's claims, and the Defendants they are asserted against, are as follows:

1. Federal-law misappropriation of trade secrets (all Defendants)

2. State-law misappropriation of trade secrets (all Defendants)

3. State-law misappropriation of confidential information (all Defendants)

4. Federal Lanham Act violations (false and misleading representations) (ListReports and Shah)

5. State-law business defamation (ListReports and Shah)

6. State-law product disparagement (ListReports and Shah)

7. State-law unfair competition and false advertising (all Defendants)

8. State-law deceptive trade practices (ListReports and Shah)

9. State-law tortious interference with contractual relations (all Defendants)

10. State-law tortious interference with economic advantage (all Defendants)

11. State-law breach of contract (ListReports, Shiozaki, and Yang)

12. State-law unjust enrichment (all Defendants)

13. State-law conversion (all Defendants)

HBM alleges that the Court has federal question, diversity, and supplemental subject matter jurisdiction over these claims. (Compl. at ¶¶ 7–8.)

Following the filing of Defendants' Motion to Dismiss, and at the request of HBM, Magistrate Judge Noel allowed limited written discovery on the issue of personal jurisdiction. That discovery was incorporated into affidavits and declarations accompanying the motion papers. The Court considers that factual record on a Rule 12(b)(2) motion.

## II. DISCUSSION

### A. Legal Standard

The parties disagree about HBM's burden of proof in establishing that personal jurisdiction exists over Defendants. As described above, the parties have engaged in limited written jurisdictional discovery, but there have been no depositions, evidentiary hearings, or broader discover related to the substance and merit of HBM's claims. Defendants argue that to survive their Motion to Dismiss, HBM must "prove" facts supporting personal jurisdiction, including the substance of its claims (e.g., that Defendants misappropriated HBM's confidential and trade secret information). (*See* Defs.' Reply in Supp. ("Defs.' Reply") at 2 [Doc. No. 58]; Defs.' Second Suppl. Br. in Supp. ("Defs.' Second Suppl. Br.") at 1 n.1, 2, 9–10 [Doc. No. 110]; Defs. Third Suppl. Br. in Supp. ("Defs.' Third Suppl. Br.") at 3, 4–5, 6, 8–10 [Doc. No. 141].) However, Defendants overstate HBM's burden of proof at this early stage of the litigation.

In general, to survive a motion to dismiss for lack of personal jurisdiction, "a plaintiff must make a prima facie showing that personal jurisdiction exists, which is

accomplished by pleading sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (citation and alterations omitted). This evidentiary standard is "minimal," although the pleadings may be "tested" with affidavits and exhibits supporting and opposing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *Id.* at 592. "We must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in its favor in deciding whether the plaintiff made the requisite showing." *Id.*

The burden of proof can change somewhat when the parties engage in full blown jurisdictional discovery and submit evidence in support and in opposition to a motion to dismiss.

> [W]here . . . the parties submit affidavits to bolster their positions on the motion, and the district court relies on the evidence, the motion is in substance one for summary judgment. The plaintiff bears the burden of proof on the issue of personal jurisdiction, and must establish jurisdiction by a preponderance of the evidence at trial or when the court holds an evidentiary hearing.

*Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citations omitted). However, even on a more developed record, a court must resolve all factual conflicts in the plaintiff's favor. *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). "[T]he action should not be dismissed for lack of jurisdiction if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Creative Calling Sols.*, 799 F.3d at 979.

Here, the parties have engaged in limited written discovery on the issue of personal jurisdiction, but there has been no broader discovery on personal jurisdiction or on HBM's claims, or any evidentiary hearings. Thus, the more lenient prima facie standard controls. *See Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1013–14 (D. Minn. 2008) ("When personal jurisdiction is contested, the plaintiff must ultimately prove, by a preponderance of the evidence, facts establishing that the court has personal jurisdiction over the defendant. But the plaintiff need not do so until trial or until the court holds an evidentiary hearing. When a district court considers only affidavits or other written evidence in connection with a Rule 12(b)(2) motion, the plaintiff need only make a prima facie showing of jurisdiction.").

### B. Personal Jurisdiction

At its core, the personal jurisdiction analysis requires the Court to consider two issues: (1) whether the forum state's (here, Minnesota) long-arm statute permits the exercise of personal jurisdiction and (2) if the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. *See Creative Calling Sols.*, 799 F.3d at 979. "These two inquiries collapse into one, however, because Minnesota's long-arm statute extends jurisdiction to the outer limits of the Due Process Clause." *Custom Conveyor Corp. v. Hyde*, No. 16-cv-3835 (RHK/HB), __ F. Supp. 3d. __, 2017 WL 708713, at *2 (D. Minn. Feb. 22, 2017); *see Rilley v. MoneyMutual, LLC*, 884 N.W.2d 321, 327 (Minn. 2016), *cert. denied,* 137 S. Ct. 1331 (2017) ("We have held that Minnesota's long-arm statute extends the personal jurisdiction of Minnesota courts as far as the Due Process Clause of the federal constitution allows." (citations and alteration omitted)). "The primary

focus of our personal jurisdiction inquiry is the defendant's relationship to the forum State." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, <u>137 S. Ct. 1773, 1779</u> (2017). Personal jurisdiction is found where the defendant has "certain minimum contacts [with the forum] . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Walden v. Fiore*, <u>134 S. Ct. 1115, 1121</u> (2014) (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, <u>326 U.S. 310, 316</u> (1945)).

### 1. General Personal Jurisdiction

There are two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co.*, <u>137 S. Ct. at 1780</u>. "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Id.* (emphasis original). However, "only a limited set of affiliations with a forum will render a defendant amenable to [general] jurisdiction there." *Daimler AG v. Bauman*, <u>134 S. Ct. 746, 760</u> (2014).

> For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home. With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction.

*Id.* (citations and alternations omitted). A corporate defendant's state of incorporation and principal place of business are not the exclusive forums for general personal jurisdiction. *Id.* But, the mere fact that a corporate defendant does even "substantial, continuous, and systematic" business in a forum—where it also does "sizable" business in other forums—does not allow for general personal jurisdiction. *Id.* at 761–62.

Specific personal jurisdiction, on the other hand, "is very different." *Bristol-Myers Squibb*, 137 S. Ct. at 1780. "In order for a state court to exercise specific jurisdiction, the *suit* must arise out of or relate to the defendant's contacts with the forum." *Id.* (emphasis original, citations, and alternations omitted). "For this reason, 'specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id.* (quoting *Goodyear Dunlop Tires Operations*, *S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Initially, HBM only argued that the Court had specific personal jurisdiction over Defendants. (*See* Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss ("Pls.' Mem. in Opp.") at 1 [Doc. No. 53].) However, after completing jurisdictional discovery, HBM suggested that there was evidence that supported asserting general personal jurisdiction. (*See* Pls.' Suppl. Mem. in Opp. ("Pls.' First Suppl. Br.") at 2–4 [Doc. No. 70].) At the hearing on the Motion to Dismiss, the Court inquired whether HBM was claiming general personal jurisdiction, to which counsel responded that HBM would not "rely" on general jurisdiction, but would instead "focus on specific jurisdiction."

To the extent HBM argues that the Court has general personal jurisdiction over any of the Defendants, this contention is easily dispatched. ListReports is a California corporation with its principal place of business in that state. *See supra* Part I.A.5. Although it does business in Minnesota, that business accounts for roughly five percent of its annual revenue. *Id.* To find that this "level" of in-forum business allowed for general personal jurisdiction "would scarcely permit out-of-state defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render

them liable to suit." *Daimler*, <u>134 S. Ct. at 761</u>–62 (citations omitted). The Individual Defendants are also all residents of California and have no personal connection to Minnesota. *See supra* Part I.A.2. Simply put, there is no evidence that any of the Defendants have the sort of "continuous and systematic" affiliations with Minnesota that would render them "essentially at home" here. *See Daimler*, <u>134 S. Ct. at 761</u>.

### C. Specific Personal Jurisdiction

The Eighth Circuit has identified five factors for courts to consider when deciding whether to exercise personal jurisdiction:

> (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of [Minnesota] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties.

*Johnson v. Arden*, <u>614 F.3d 785, 794</u> (8th Cir. 2010). "The first three factors are primary factors, and the remaining two factors are secondary factors. The third factor distinguishes whether the jurisdiction is specific or general." *Id.* (citation omitted). However, the five-factor test "is not to be mechanically applied." *Pangaea, Inc. v. Flying Burrito LLC*, <u>647 F.3d 741, 746</u> n.4 (8th Cir. 2011) (citation omitted).

Specific personal jurisdiction requires "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State." *Bristol-Myers Squibb Co.*, <u>137 S. Ct. at 1781</u> (citations and alterations omitted). The focus is on "the relationship among the defendant, the forum, and the litigation." *Walden*, <u>134 S. Ct. at 1121</u>. The defendant's "suit-related conduct must create a substantial connection with the forum State." *Id.* The contacts to be considered are those

between the defendant and the forum, *not* the defendant's contacts with the plaintiff or third parties. *Id.* at 1122. "To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123.

In addition to these considerations, the *Calder* effects test—derived from *Calder v. Jones*, 465 U.S. 783 (1984)—is especially relevant here. This test is applied in cases involving intentional torts (e.g., misappropriation, tortious interference, and defamation). *Walden*, 134 S. Ct. at 1123. The crux of the test is whether the effects of the defendant's tortious conduct connect him/her to the forum and "not just the plaintiff." *See id.* at 1123–24. For instance, not only is the reputational injury of libel felt where the slanderous statement is publicized, but the tort is actually committed when and where the slanderous statement is made. *See id.* at 1124. Thus, a defendant who publishes a slanderous article should reasonably expect to be haled into court where the article relates to the plaintiff's activities in the forum, the plaintiff's reputation is centered in the forum, and the article is published in the forum. *See id.*

However, the mere fact that a plaintiff resides in the relevant forum and thus experiences the injury of a tort there is not enough to satisfy the *Calder* effects test. The Eighth Circuit construes the *Calder* effects test narrowly, holding that "absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction." *Johnson*, 614 F.3d at 794. Thus, a plaintiff must show that "the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm,

the brunt of which was suffered-and which the defendant knew was likely to be suffered-[in the forum state]." *Id.* at 796 (citation omitted, alterations in original). The Supreme Court recently explained that "[r]egardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 134 S. Ct. at 1125.

What impact, if any, a defendant's use of the internet to commit an intentional tort has on specific personal jurisdiction and the Calder effects test has not been directly addressed by the Supreme Court or the Eighth Circuit. Rather, the Supreme Court declined to address how the *Calder* effects test should operate where an intentional tort is committed using the internet or other electronic means. *Walden*, 134 S. Ct. at 1125 n.9. Specifically, the Court left "for another day" the questions of "whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State." *Id.*; *but see Erickson v. Nebraska Mach. Co.*, No. 15-CV-01147-JD, 2015 WL 4089849 at *4 (N.D. Cal. July 6, 2015) ("the fact that [*Walden*] held that it would be a violation of the defendant's due process rights to be forced to submit to personal jurisdiction based merely on his or her knowledge of the plaintiff's location suggests that the high court's holding cannot be cabined to torts committed in the non-virtual world").

Following *Walden*, several district courts have grappled with employing the *Calder* effects test where the defendants allegedly used the internet to commit offenses like misappropriation of trade secrets, copyright, trademark, or patent infringement, defamation,

"hacking," and other torts involving the unauthorized access of computer data. *See, e.g.*, *Christie v. Nat'l Inst. for Newman Studies*, No. CV 16-6572 (FLW), __ F. Supp. 3d. __, 2017 WL 2798250 (D.N.J. June 28, 2017) (finding specific personal jurisdiction); *Caracal Enterprises LLC v. Suranyi*, No. 16-CV-05073-RS, 2017 WL 446313 (N.D. Cal. Feb. 2, 2017) (finding no specific personal jurisdiction); *Blizzard Entm't, Inc. v. Bossland GmbH*, No. SACV161236DOCKESX, 2017 WL 412262 (C.D. Cal. Jan. 25, 2017) (finding specific personal jurisdiction); *Strabala v. Zhang*, 318 F.R.D. 81 (N.D. Ill. 2016) (finding specific personal jurisdiction for claims of defamation, but not for claims of tortious interference); *Erickson*, 2015 WL 4089849 (finding no specific personal jurisdiction). Importantly here, where specific personal jurisdiction was found in these cases, the courts relied on evidence and allegations that the defendants expressly aimed their tortious conduct at the forum and not the fact that the plaintiffs simply suffered their injuries in their respective forums by virtue of residing there. *See Christie*, 2017 WL 2798250 at *8; *Blizzard Entm't*, 2017 WL 412262 at *5–6; *Strabala*, 318 F.R.D. at 109–11. Thus, even when addressing tortious conduct involving the internet, "the jurisdictional inquiry should focus on where a defendant intended to direct its tortious conduct and whether that defendant knew, or should have known, its activities would be felt in that forum State." *Christie*, 2017 WL 2798250 at *6.

Since specific personal jurisdiction hinges on the connection between the defendant and the forum, the analysis must be specific to each defendant. *See Calder*, 465 U.S. at 790 ("Each defendant's contacts with the forum State must be assessed individually."); *Select Comfort Corp. v. Kittaneh*, 161 F. Supp. 3d 724, 731 (D. Minn. 2014) (holding that each defendant's forum contacts must be considered independently). For instance, ListReports'

contacts with Minnesota that did not involve the Individual Defendants may not be attributed to them for the purpose of finding specific personal jurisdiction. *See Calder*, <u>465 U.S. at 790</u> ("Petitioners are correct that their contacts with [the forum] are not to be judged according to their employer's activities there."). HBM argues that the Court may exercise specific personal jurisdiction over all Defendants, but often fails to distinguish between each Defendant's conduct. The Court is careful to consider each Defendant individually.

### 1. The Individual Defendants

HBM alleges that the Individual Defendants were directly involved with misappropriating HBM's trade secrets and confidential information and selling Nest.Me to Minnesota-based lenders. However, as just described, the key consideration is whether there is evidence that the Individual Defendants expressly aimed their conduct at Minnesota and knew that the brunt of the harm would be felt there.

*Johnson* offers a useful comparison to this case. There, the plaintiffs alleged that the defendant ("Heineman")—who was the plaintiffs' former business associate, but not a forum resident—posted a defamatory comment about them on a website for consumer complaints and infringed on their trademark by using it on her own website. *Johnson*, <u>614 F.3d at 788</u>–89, 795–96. The defamatory comment attributed to Heineman specifically stated that plaintiffs were located in Missouri (the relevant forum). *Id.* at 796. Plaintiffs did business in Missouri, but also in other states, whereas Heineman did business in others states, but there was no evidence that she sold to—or had interactions with—customers in Missouri. *Id.* at 788–89, 797–98.

The Eighth Circuit held that "the inclusion of 'Missouri' in the posting was

incidental and not 'performed for the very purpose of having their consequences' felt in Missouri. There is no evidence that the . . . website [where the comment was posted] specifically targets Missouri, or that the content of Heineman's alleged postings specifically targeted Missouri." *Id.* at 796 (quoting *Dakota Indus. v. Dakota Sportswear, Inc.*, [946 F.2d 1384, 1391](#) (8th Cir.1991)). Despite the fact that Heineman knew that the plaintiffs were located and did business in Missouri, the Eighth Circuit concluded that "[p]osting on the internet from Colorado an allegedly defamatory statement including the name 'Missouri' in its factual assertion does not create the type of substantial connection between Heineman and Missouri necessary to confer specific personal jurisdiction." *Id.* at 797. Similarly, the fact that Heineman allegedly infringed on the plaintiffs' trademark by using it on her own website did not allow for specific personal jurisdiction. *Id.* at 797–98. The plaintiffs and Heineman both did business in numerous forums—but there was no evidence Heineman did business in Missouri—and the Eighth Circuit found that Heineman's website was not "uniquely or expressly aimed at Missouri . . . ." *See id.*

Here, there is evidence that the Individual Defendants targeted *HBM* with their alleged tortious conduct, but no evidence that they expressly aimed their conduct at *Minnesota* or knew that the brunt of the resulting harm would be felt here. Each of the Individual Defendants accessed or viewed HBM's Proprietary Products, but there is no evidence that in doing so they were aware that HBM is based in Minnesota. HBM's Terms of Use gave no indication of a Minnesota connection nor did they contain a forum-selection or choice-of-law clause. *See In re: RFC & ResCap Liquidating Tr. Litig.*, No. 13-cv-3451 (SRN/HB), [2017 WL 1483374](#), at *4–5, 11 (D. Minn. Apr. 25, 2017) (holding that a valid

and enforceable forum-selection clause in a contract allowed for specific personal jurisdiction over even the individual defendants, who were officers of the corporate defendant, but who otherwise had insufficient contacts with the forum). HBM's website merely lists a phone number with a Minnesota area code in the "Contact Us" section. There is no indication that the Individual Defendants knew that HBM's Proprietary Products were stored or hosted on servers in Minnesota.

Furthermore, HBM's Proprietary Products are sold and used nationwide. There is no evidence that HBM does a significant portion of its business in Minnesota, or if it does, that the Individual Defendants were aware of this fact. Similarly, there is no evidence that the Individual Defendants were involved in luring away any of HBM's Minnesota-based customers.[6] In fact, there is no evidence that HBM lost any of its Minnesota-based customers to Nest.Me. *See supra* Part I.A.3, 5 (the only clients HBM lost—or was forced to offer a discount to—are Prospect and Skyline, but there is little, if any, evidence that either company operates in Minnesota). Moreover—to the extent that the Individual Defendants are involved with marketing and supporting Nest.Me—it is clear that these efforts are national in scope, meaning that they were not uniquely aimed at Minnesota.

The Court finds that the Individual Defendants' conduct related to Minnesota was "incidental and not performed for the very purpose of having their consequences felt in [Minnesota]." *See Johnson*, 614 F.3d at 796. Even assuming that the Individual Defendants knew HBM was located in Minnesota, that fact "would not allow plaintiffs to

---

[6] Evidence of Shiozaki's and Yang's knowledge of or involvement with the marketing and support of Nest.Me in Minnesota is particularly scarce. *See supra* Part I.A.5.

satisfy the *Calder* test because 'personal jurisdiction analysis must focus on the defendant's contacts with the forum state, not the defendant's contacts with a resident of the forum.'" *See Caracal Enterprises*, 2017 WL 446313 at *3 (quoting *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015)); *Walden*, 134 S. Ct. at 1122 (holding that courts must consider "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there" and that "the plaintiff cannot be the only link between the defendant and the forum"); *see also Viracon, Inc. v. J & L Curtain Wall LLC*, 929 F. Supp. 2d 878, 886 (D. Minn. 2013) (holding that the *Calder* effects test "requires more than knowledge that a Minnesota company will suffer consequences from the conduct"); *In re: RFC & ResCap Liquidating*, 2017 WL 1483374 at *11 ("Although the Complaint certainly suggests that the Individual Defendants acted as they did to harm a Minnesota company, it is bereft of allegations from which the Court could conclude that the effects of those actions were meant to be felt in this forum *specifically*." (emphasis original)). The mere fact that HBM will suffer the effects (i.e. damages) of the Individual Defendants' alleged misappropriation in Minnesota also does not satisfy the *Calder* test. *See Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir. 2011) (holding that the *Calder* effects test was not met despite the fact that the plaintiff would suffer the effects of the defendant's deliberate refusal to pay in the forum); *Carpenter v. All Am. Games*, No. CV16-01768-PHX DGC, 2017 WL 1090706, at *2 (D. Ariz. Mar. 23, 2017) ("[E]ffects in a forum State, even if foreseeable, are not sufficient for specific personal jurisdiction without some defendant-initiated contact with the State."); *Erickson*, 2015 WL 4089849 at *4 ("any injury that [the defendant's] alleged copyright infringement caused is not localized in California,

apart from the fact that plaintiffs are based there"). Simply put, the Court cannot find that the Individual Defendants' conduct creates a "substantial connection" with Minnesota or "connects [them] to the forum in a meaningful way." *See Walden*, 134 S. Ct. at 1121, 1125.

Considering Shah's additional tortious conduct in allegedly defaming HBM to Skyline and interfering with HBM's business relations with Skyline and Prospect does not alter the outcome. None of this conduct was directed at or carried out in Minnesota, and neither Skyline nor Prospect is located in Minnesota, distinguishing this from other defamation cases. *See Strabala*, 318 F.R.D. at 109–11 (finding specific personal jurisdiction where the defendants knew that the plaintiff was based out in Illinois and sent defamatory emails to the plaintiff's clients, who were also based in Illinois, thereby "purposefully aim[ing] their conduct at Illinois where the e-mail recipients were located"); *Calder*, 465 U.S. at 788–89 (finding specific personal jurisdiction where the defendants published a libelous story in California, which concerned the plaintiff's activities and television career in California, and was based on California sources). The only connection between Shah's conduct and Minnesota is the fact that HBM felt the negative effects of it here, but this is not enough for specific personal jurisdiction. *See Carpenter*, 2017 WL 1090706 at *2 (holding that the *Calder* test was not satisfied by the defendant's defamatory email, sent to hundreds of individuals and affiliates nationwide, because the only clear connection to the forum was the fact that the plaintiff felt the effects of the email there).

## 2. ListReports

Whether there is specific personal jurisdiction over ListReports is a closer call because the Court may consider all of the forum-related conduct of ListReports'

employees—including Duffy and Joval.[7]   As a result, there is more "direct" evidence connecting ListReports' conduct to Minnesota.  For instance, there is limited evidence that ListReports—through its co-founder and employee, Duffy—knew that HBM was located in Minnesota.  *See supra* Part I.A.4.  Similarly, ListReports has contacts with Minnesota in that it markets and supports Nest.Me to Minnesota-based lenders, most notably by sending its employees to Minnesota to educate clients about Nest.Me.  *See supra* Part I.A.5.  However, even these forum connections do not satisfy the *Calder* effects test because they do not establish that ListReports uniquely or expressly aimed its conduct at Minnesota, or that it knew the brunt of the resulting harm would be felt in Minnesota.

ListReports' knowledge that HBM was based in Minnesota does not satisfy the *Calder* effects test because it "improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis."  *See Walden*, 134 S. Ct. at 1125; *Christie*, 2017 WL 2798250 at *4; *Caracal Enterprises*, 2017 WL 446313 at *3; *Erickson*, 2015 WL 4089849 at *4.  The distinction between this case and *Walden* is that here, ListReports knew HBM resided in Minnesota *and* it allegedly misappropriated trade secrets and confidential information from HBM that were stored on servers located in Minnesota.  *See Walden*, 134 S. Ct. at 1124–25 (noting that the property seizure and other conduct underlying the plaintiffs' claims occurred entirely outside of the forum).  However, even this more direct connection between ListReports' conduct and

---

[7] Although the forum contacts/conduct of an employer are generally not attributed to its employees and officers, *Calder*, 465 U.S. at 790, the forum contacts/conduct of employees are often attributable to their employers for the purpose of establishing specific personal jurisdiction over the employer.  *See Daimler*, 134 S. Ct. at 759 n.13.  ListReports has not challenged such attribution.

Minnesota is not enough for specific personal jurisdiction.

Cases where courts found the *Calder* effects test was met based on the defendants' intentional tortious conduct over the internet are distinguishable in important ways from the present matter. For instance, one court found specific personal jurisdiction where the defendants knew the plaintiff resided in New Jersey (because the plaintiff was a former employee, informed the defendants of his residence in New Jersey, and the defendants regularly contacted him in New Jersey), hacked into his computer, and deleted personal emails related to an ongoing employment dispute between the parties. *Christie*, 2017 WL 2798250 at *7. Based on these allegations, the court held that "Defendants expressly aimed tortious conduct at Plaintiff in New Jersey and knew that Plaintiff would feel the brunt of the harm in New Jersey." *Id.* at *8. However, the court noted that "an act performed over the Internet—without specifically targeting a forum—cannot confer nationwide jurisdiction." *Id.* "Rather, where a tortious act is expressly aimed, or affirmatively calculated to be felt, and where the brunt of the harm occurs, make up the appropriate measure." *Id.*

Here, there is no evidence that ListReports expressly targeted Minnesota or affirmatively calculated that its conduct would be primarily felt here. ListReports' alleged misappropriation targeted *HBM* and did not involve any contact with *Minnesota* besides the incidental fact that HBM's Proprietary Products are hosted on servers based in Minnesota.[8] Although ListReports' conduct was not "projected aimlessly into cyberspace," it also was

_____

[8] Although there is limited evidence to suggest that ListReports was aware of HBM's geographic location in Minnesota, there is no evidence that it understood the Proprietary Products were hosted there.

not deliberately aimed at Minnesota. *See id.* at *9 (distinguishing between the sort of "aimless" internet-based conduct that does not satisfy the *Calder* test and more "deliberate" conduct, like hacking the plaintiff's personal email account, that does); *Walden*, 134 S. Ct. at 1121–23 (holding that specific personal jurisdiction requires that the defendant's suit-related conduct must create a "substantial connection" with the forum and that the plaintiff, or the defendant's contacts with the plaintiff, cannot be the sole link between the defendant and the forum). In short, like with the Individual Defendants, ListReports' tortious conduct was not "performed for the very purpose of having their consequences felt in [Minnesota]," but was "incidental" to ListReports' efforts to compete with HBM nationwide. *See Johnson*, 614 F.3d at 796.

Moreover, there is no evidence that ListReports "took" one of HBM's Minnesota-based customers, or specifically targeted Minnesota with its Nest.Me sales and marketing. Instead, ListReports' competitive efforts were nationwide and generated numerous customers, some of whom are located in Minnesota. The fact that HBM feels the effects of losing customers to ListReports in Minnesota because it resides here does not allow for specific personal jurisdiction. *See Viasystems*, 646 F.3d at 594; *Carpenter*, 2017 WL 1090706 at *2; *Erickson*, 2015 WL 4089849 at *4.

The path to specific personal jurisdiction through the *Calder* effects test is quite narrow. The defendant's conduct must connect it to the *forum*—not just the plaintiff— in a substantial and meaningful way, and the defendant's relationship with the plaintiff alone cannot serve as the basis for finding specific personal jurisdiction. *See Walden*, 134 S. Ct. at 1122–25. This test is especially difficult to satisfy when the tortious conduct at issue

involves the internet and where the parties are competitors who operate at arm's-length online and in many forums. The result is that some plaintiffs—like HBM—will have to pursue their claims in the forum where the alleged tortfeasor resides. Reasonable minds can debate about the fairness of this result, but it is what the Supreme Court found the due process limitations of the Constitution require so as not to "offend traditional notions of fair play and substantial justice." *See id.* at 1121 (citation omitted). The Court holds that there is no specific personal jurisdiction over ListReports.

### D. Transfer

Defendants aver that personal jurisdiction exists over each of them in the Central District of California. (Defs.' Mem. in Supp. at 17 [Doc. No. 34].) Even where a court lacks personal jurisdiction, it retains the ability to transfer the case to a district where the case could have been brought. 28 U.S.C. § 1631; *Superior Edge, Inc. v. Maricopa Cty. Cmty. Coll. Dist.*, 509 F. Supp. 2d 786, 795 (D. Minn. 2007) ("Where, as here, a district court lacks personal jurisdiction over the defendant, the court may dismiss the action or transfer it to a district where it could have been brought."). A transfer is appropriate "if it is in the interest of justice . . . ." 28 U.S.C. § 1631. "Generally, transfer will be in the interest of justice because normally dismissal of an action that could be brought elsewhere is time-consuming and justice-defeating." *Sec. Alarm Fin. Enterprises, L.P. v. Nebel*, 200 F. Supp. 3d 976, 987 (N.D. Cal. 2016) (citation omitted). An exception to this general presumption in favor of transfer is if the claims to be transferred are frivolous or were filed in bad faith. *Amity Rubberized Pen Co. v. Mkt. Quest Grp. Inc.*, 793 F.3d 991, 996 (9th Cir. 2015).

Although neither party raised the issue, the Court finds that transferring this case to the Central District of California serves the interests of justice. Defendants aver that personal jurisdiction exists over each of them in that district and thus there is no question that HBM's claims could be pursued there. (*See* Defs.' Mem. in Supp. at 17 [Doc. No. 34].) Furthermore, there is no evidence that HBM's claims are frivolous or in bad faith.

## III. ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss for Lack of Personal Jurisdiction or, In the Alternative, to Transfer ("Mot. to Dismiss") [Doc. No. 33] is **GRANTED** as follows:

    a. The Court **holds** that it lacks personal jurisdiction over each of the Defendants;

    b. This action is **TRANSFERRED** to the United States District Court for the Central District of California;

    c. The Clerk of Court is **directed** to transfer this action as just described.

2. This Order is filed under seal. **Within fourteen days of the date of this Order**, the parties are **ORDERED to show cause** as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long. The parties will submit briefs, each no longer than seven pages, on this subject. Each party will also submit a copy of this Order showing its proposed redactions. If the parties agree on these issues, they may submit a joint brief and/or proposed redacted order. The parties will **not** file these briefs and proposed orders on CM/ECF, but will instead submit them to the chamber's email.

Dated:  August 25, 2017                     s/ Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge